Filed 8/22/14  P. v. Parker CA2/5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B247064 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA390544) |
| v. | |
| MELVIN PARKER, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of the County of Los Angeles, Craig J. Mitchell, Judge.  Affirmed as modified.

Emry J. Allen, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Michael C. Keller and David A. Wildman, Deputy Attorneys General, for Plaintiff and Respondent.

## INTRODUCTION

Defendant and appellant Melvin Parker (defendant) was convicted of second degree murder (Pen. Code, § 187, subd. (a)[1]). On appeal, he contends that there is not substantial evidence to support the jury's finding of malice; his trial counsel provided ineffective assistance of counsel; the trial court violated his constitutional right of self-representation when it denied his *Faretta*[2] motion; and the trial court erred in instructing the jury on the issue of causation, and by not instructing, sua sponte, on the lesser included offenses of voluntary and involuntary manslaughter. The Attorney General contends that defendant is not entitled to the 85 days of conduct credit awarded to him by the trial court. We order that the abstract of judgment[3] be amended to provide that defendant is not entitled to 85 days of conduct credit, and we otherwise affirm the judgment.

## BACKGROUND

### A.     Factual Background

#### 1.     *Prosecution Evidence*

On July 29, 2011, defendant had a physical altercation with Kevivon Brown in San Julian Park on Fifth Street in Los Angeles. Defendant and Brown eventually left the park, and defendant appeared to be upset.

---

[1]     All statutory citations are to the Penal Code unless otherwise noted.

[2]     *Faretta v. California* (1975) 422 U.S. 806 (*Faretta*).

[3]     The record did not include the abstract of judgment. We obtained a copy of the abstract of judgment from the trial court, and order the record augmented to include it.

Vincent Hall testified that he saw Brown walk to the Union Rescue Mission (Mission) area, and when Brown arrived he walked in circles appearing to be angry. Defendant and co-defendant Wilina Patterson[4] also walked together to the Mission area.

Hall said that when the parties arrived at the Mission area, defendant approached Brown and grabbed an object from Patterson's hand. Patterson had taken the object out of her pocket. Defendant walked around Brown, and then punched him more than eight times in the face, chest, and stomach. While defendant punched Brown, Patterson said, "Baby, get him. Baby, get him." Hall heard someone say that defendant had a knife. Then, as defendant administered the final two punches, Hall saw a small gray knife of about four or five inches in length in defendant's hand.

Laquinta Stewart testified that she saw defendant and Brown punch each other at the Mission area. Stewart saw a small knife in defendant's hand during the fight. Patterson had reached into her purse, took the knife out, and handed it to defendant. Stewart only saw the "top" of the knife that she believed was one half inch of the knife blade. She estimated that the knife was about four and one half inches long. Stewart also heard Patterson say during the fight, "Get him."

Yola Montgomery also witnessed the incident at the Mission area. Montgomery first saw defendant and Patterson walking on Fifth Street; Brown was sitting down. Defendant went to Brown and hit Brown on the left side of his jaw. Brown stood up and hit defendant back. Defendant pulled out a knife from his pocket; the knife was "[n]o bigger than a [four inch] switchblade." Defendant stabbed Brown eight times. Brown was stabbed on the left side of his body, including the chest area near the abdominal area; his left hip; twice on the right side of his ribcage; and underneath his chest. Defendant then dropped the knife. Montgomery saw blood "gushing out" from Brown. After defendant stabbed Brown, Patterson told defendant to pick up the knife, and defendant and Patterson left the Mission area together.

---

[4] Patterson is not a party to the appeal.

3

Montgomery was about two feet behind Brown when defendant stabbed him. A videotape of the stabbing incident was played for the jury. Montgomery described the events depicted in the videotape as defendant striking Brown while Brown was sitting; Brown standing up; defendant and Brown fighting; and defendant having a knife in his hand and stabbing Brown with it.

Hall testified that after the stabbing, he saw defendant hand the knife to Patterson. Patterson put the knife in her pocket, and defendant and Patterson left the Mission area. Brown sustained a cut on his eye and knife wounds to his chest and stomach. Brown was bleeding from those wounds.

Stewart heard Patterson say, "Let's go" to defendant, and defendant left the Mission area. Stewart saw Brown lying on the ground, bleeding. There was a pool of blood. She told Los Angeles Police Department Officer Griselda Tapia that she saw the knife and it was small.

Hall followed defendant and Patterson. Hall saw City of Los Angeles Police Officer Jesus Toris, pointed to defendant and Patterson, and told Officer Toris that defendant had just stabbed somebody. Officer Toris went to the Mission area and saw "somebody who appeared to be a victim of an attack."

On July 29, 2011, Dr. Jennifer Smith, a trauma surgeon, treated Brown at Los Angeles County/USC Medical Center. When she first saw Brown, he was in an intensive care unit and not in very good condition; he had a large volume of blood coming out of the chest tube that had been placed there. Brown had sustained two wounds to his face, one wound in his stomach, one wound near his groin, and two wounds in his back. Brown had two holes in his lung that had to be stapled, and a lateral injury to his heart. One of the main blood vessels to his heart, the left anterior descending, was lacerated. It was a life threatening injury.

During Brown's surgery, he was in critical condition and extremely unstable. His blood pressure was low and he was losing much blood. Brown went into cardiac arrest. Therefore, his heart was manually compressed to provide blood to his vital organs; medications were injected directly into his heart; and warm water was used to stimulate

4

his heart muscles. Forty-five minutes elapsed while these methods were used to "restart his heart," which Dr. Smith described as an "extremely prolonged" amount of time. Brown regained "some cardiac activity," but his condition remained critical, and he required cardiac medication and a balloon pump to maintain cardiac activity. Dr. Smith stated that a patient goes into cardiac arrest during an operation because the patient has lost too much blood and cannot recover, or he has an air embolus from a lung injury, causing air to enter the veins of the lung and travel to the heart, coronary arteries, and the brain.

Because Brown was in such a critical and unstable condition at the end of the operation, the doctors determined that it was too dangerous to try to close his chest. Following the operation, Brown showed no signs of responsiveness. He was not moving and was not performing normal activities.

Brown underwent a second operation to close his chest. Brown also underwent an MRI, the results of which were consistent with his having experienced a loss of blood flow, and therefore a lack of oxygen to his brain.

On August 9, 2011, while Brown remained in the intensive care unit, a tube was placed in his neck so that he could be placed on a ventilator, and a feeding tube was placed in his stomach. It was deemed very unlikely that Brown would ever live without the ventilator and feeding tube.

Dr. Smith opined that one of the most common complications of a person being transferred to a long-term care facility who is in a persistent vegetative state and on a ventilator and feeding tube is that a sepsis infection can develop on the intravenous line. Brown "was not septic" while he was at Los Angeles County/USC Medical Center. Brown was transferred to Longwood Manor Convalescent Hospital, and when he left he was in a coma and on a ventilator, and he required use of the feeding tube.

On August 23, 2011, Brown was admitted to Longwood Manor Convalescent Hospital. When Brown arrived at the facility, he had a collapsed lung and a chest tube had been inserted into his lung. Dr. John Lui treated Brown at Longwood Manor

Convalescent Hospital. Brown was unresponsive and in a "persistent vegetative state" during the duration of his stay at the facility.

Brown was transferred from Longwood Manor Convalescent Hospital to the emergency room at Olympia Medical Center. At the time he was transferred, he was breathing fast, his heart rate was fast, and he was under distress. Dr. Lui opined that it was "standard of care" for Brown to be transferred to the emergency room at Olympia Medical Center. He explained, "Convalescent care such as Longwood couldn't do immediate x-ray, couldn't do a CT scan. Couldn't do a stat lab assessment. [¶] So, [Brown] needed to be transferred to a higher level of care."

On September 16, 2011, Dr. Richard Powell, a physician for about 35 years, treated Brown at Olympia Medical Center. Brown was transferred to that facility "because of the critical nature of his condition," and the emergency room at Olympia Medical Center was the nearest emergency room to Longwood Manor Convalescent Hospital. According to Dr. Powell, when Brown was at Longwood Manor Convalescent Hospital, "a subacute facility," he was on a ventilator, his blood pressure began to decline, and he developed into an unstable and grave condition. When Brown was admitted into Olympia Medical Center, he was in a coma, was not responsive, and appeared to be in a critical condition beyond being on a respirator. Brown was in septic shock. A few times when Brown was in the emergency room at Olympia Medical Center, he had cardiac arrests— i. e., his heart stopped—and he died on September 16, 2011, the day he was admitted to Olympia Medical Center. Dr. Powell opined that the immediate cause of Brown's death was cardiac arrest due to septic shock, and Brown would not have been in that condition if he had not suffered the multiple stab wounds.

Deputy Medical Examiner Vadims Poukens performed an autopsy on Brown. He determined that the death was caused by complications from multiple stab wounds, including "pericardial adhesions," inflammations in the chest, pneumonia, peritonitis from leakage of the gastric tube, necrosis of the liver, and sepsis.

Hall and Montgomery identified defendant from a photographic line up as the person who stabbed Brown. Defendant and Patterson were arrested. Patterson's purse

6

was taken into custody. A knife was not found in the purse, but a knife sheath was located in it. A DNA analyst determined to a reasonable degree of scientific certainty that Brown's DNA was located on the purse, but defendant's DNA was not located there.

### 2. *Defendant's Evidence*

Dr. Silvia Comparini, defendant's expert in forensic pathology, examined Brown's medical file, and said that Brown was in need of surgery because he suffered the stab wounds. She concluded that the cause of Brown's death was "[s]tatus postsurgical intervention associated with air embolism during cardiac surgical repair, followed by brain death, septicemia, anemia, and cachexia." Dr. Comparini said that the embolus occurred while Brown was undergoing surgery at Los Angeles County/USC Medical Center. She opined that there was a two-hour delay in admitting Brown to surgery after the stab wounds were noticed, and therefore Brown was too weak to recover from the embolus. She could not find an explanation for the two hour delay in taking Brown to surgery. According to Dr. Comparini, Brown would have survived had the staff at Los Angeles County/USC Medical Center taken him to surgery "long before they did," and had Brown been operated on "much sooner" than he was, his chances of survival would have been "much higher." Dr. Comparini said that the staff at the hospital committed medical malpractice in delaying Brown's surgery.

Defendant testified that Brown told him that Patterson, defendant's girlfriend, was disrespecting Brown and asked defendant to talk to her. Brown stated this in an aggressive manner, saying, "Man, your bitch is disrespecting me. You understand you need to check your broad, man." Defendant did not want to fight because he had just been released from state prison several weeks earlier, but Brown approached him aggressively, so they fought. Defendant sustained a cut on his left wrist, ultimately requiring twelve stitches.

Defendant said that when he fought with Brown at the park, he was "high on ecstasy." He therefore did not want to go to the hospital to treat his cut because he had just been discharged from parole and did not want to get caught using an illegal

7

substance.  Defendant instead went to his hotel room to bandage his cut and "clean up."  At that time, he was upset over the encounter with Brown.  After about one hour, defendant left the hotel room and went to a park to recover his personal belongings that he had left there and "get more drugs."

Defendant testified that it took him about 10 minutes to walk to the park.  Defendant located his personal items, and he spoke to his friend.  Defendant then saw Brown in front of the Mission.  Brown "curs[ed]" at defendant, and they fought again.  During the fight, defendant did not use a knife, although there was an antenna attached to his telephone that he was holding while punching Brown.  He did not see Patterson during this second fight, but did see her after it was over.  Patterson appeared, "Like suddenly from nowhere."

**B.      Procedural Background**

The District Attorney of Los Angeles County filed an information charging defendant with murder in violation of section 187, subdivision (a).  Following trial, the jury found defendant guilty of second degree murder in violation of section 187, subdivision (a).  The trial court sentenced defendant to state prison for a term of 51 years to life.  The trial court awarded defendant 649 days of custody credit consisting of 564 days of actual custody credit and 85 days of conduct credit.  Defendant filed a timely notice of appeal.

**DISCUSSION**

**A.      Substantial Evidence**

Defendant contends that there is not substantial evidence to support the jury's finding of malice.  We disagree.

*1.     Standard of Review*

"'In reviewing a challenge to the sufficiency of the evidence, we do not determine the facts ourselves.  Rather, we "examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—evidence that is reasonable, credible and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." [Citations.]  We presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.]  [¶]  . . .  "[I]f the circumstances reasonably justify the jury's findings, the judgment may not be reversed simply because the circumstances might also reasonably be reconciled with a contrary finding." [Citation.]  We do not reweigh evidence or reevaluate a witness's credibility. [Citation.]'  [Citations.]"  (*People v. Scott* (2011) 52 Cal.4th 452, 487.)

*2.     Analysis*

The jury was instructed on both express malice and implied malice.  "'"Murder is the unlawful killing of a human being . . . with malice aforethought.' [Citation.]  'Such malice may be express or implied.  It is express when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature.  It is implied, when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart.' [Citation.]  'Murder that is committed with malice but is not premeditated is of the second degree.' [Citations.]"  (*People v. Prince* (2007) 40 Cal.4th 1179, 1265-1266.)  "Malice will be implied 'when the killing results from an intentional act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life. [Citations.]' [Citations.]"  (*People v. Taylor* (2010) 48 Cal.4th 574, 623-624.)

Defendant contends that the evidence suggests he did not stab Brown with the intent to kill because he used a small knife and only meant to "send a message to" Brown.  There is evidence that defendant stabbed Brown eight times in various locations,

9

including his chest and ribs; blood gushed from Brown's stab wounds; and there "was a pool of blood." A jury reasonably could infer from this evidence that defendant intended to kill Brown, or at least that defendant had implied malice—he knew that his conduct endangered Brown's life and defendant acted with conscious disregard for life. (*People v. Taylor, supra,* 48 Cal.4th at pp. 623-624.)

Defendant argues that the stab wounds Brown sustained could not be expected to cause death, in contrast to stab wounds to the neck or the eye. Stabbing a person in a highly vulnerable area of the body is circumstantial evidence of an intent to kill. (*People v. Bolden* (2002) 29 Cal.4th 515.) In *People v. Moore* (2002) 96 Cal.App.4th 1105, the court stated, "Defendant argues there is no evidence of a specific intent to kill, highlighting his testimony he intended to stab but not to kill the victim. However, defendant stabbed the victim not in the arm or leg, but in the abdomen, an extremely vulnerable area of the body." (*Id.* at p. 1114.)

When Dr. Smith first saw Brown, at Los Angeles County/USC Medical Center's intensive care unit, Brown was in poor condition; he had a large volume of blood coming out of the chest tube that had been placed there. Among Brown's injuries, he had two holes in his lung, a lateral injury to his heart, and a lacerated blood vessel to his heart. Dr. Smith described Brown has having sustained a "life threatening injury." A jury reasonably could infer from this evidence that defendant stabbed Brown with requisite malice.

### B. Ineffective Assistance of Counsel

Defendant contends that his trial counsel provided ineffective assistance by abandoning his lack of intent to kill argument in closing argument, and failing to present expert testimony on "fight or flight syndrome." Defendant's counsel did not provide defendant with ineffective assistance.

10

*1.     Applicable Law*

"'To establish a violation of the constitutional right to effective assistance of counsel, a defendant must show both that his counsel's performance was deficient when measured against the standard of a reasonably competent attorney and that counsel's deficient performance resulted in prejudice to defendant in the sense that it "so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.'" [Citations.]  Preliminarily, we note that rarely will an appellate record establish ineffective assistance of counsel.  [Citation.]" (*People v. Thompson* (2010) 49 Cal.4th 79, 122.)  "We have repeatedly stressed 'that "[if] the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged[,] . . . unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation," the claim on appeal must be rejected.' [Citations.]  A claim of ineffective assistance in such a case is more appropriately decided in a habeas corpus proceeding.  [Citations.]" (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266-267.)

The burden is on defendant "to demonstrate by a preponderance of the evidence that counsel's performance was inadequate and fell below an objective standard of reasonableness [citation], i.e., that [the defendant] was deprived of 'reasonably effective assistance' [citations].  We assess the reasonableness of counsel's performance deferentially.  [Citations.]  We consider counsel's performance from his perspective, analyzing counsel's decisions based on what he knew or should have known at the time. [Citations.]  [¶]  The reasonableness of counsel's performance is assessed according to the prevailing norms at the time.  The United States Supreme Court has 'declined to articulate specific guidelines for appropriate attorney conduct and instead ha[s] emphasized that "the proper measure of attorney performance remains simply reasonableness under prevailing professional norms."' [Citations.]  [¶]  In evaluating counsel's performance, we assess both the reasonableness of counsel's decisions and the reasonableness of the investigation that underlay each decision. . . . '"[S]trategic choices

11

made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; . . . .'''" (*In re Thomas* (2006) 37 Cal.4th 1249, 1257-1258.)

"'''Reviewing courts defer to counsel's reasonable tactical decisions in examining a claim of ineffective assistance of counsel [citation], and there is a 'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" [Citations.] "[W]e accord great deference to counsel's tactical decisions" [citation], and we have explained that "courts should not second-guess reasonable, if difficult, tactical decisions in the harsh light of hindsight" [Citation.] "Tactical errors are generally not deemed reversible, and counsel's decisionmaking must be evaluated in the context of the available facts." [Citation.]'" (*People v. Jones* (2003) 29 Cal.4th 1229, 1254.)

### 2. *Abandonment of the Lack of Intent to Kill*

#### a) Background Facts

Defendant's counsel stated during his closing arguments to the jury that, "We do know that [defendant] was angry, and we have to consider, was he going to retaliate in some fashion? And I think the answer is probably pretty clear that he does intend to retaliate in some fashion, but not necessarily in the fashion of killing the person. He's been cut on his arm. The likelihood in one of the scenarios going through his mind is I'm going to go back and bust him up a bit. Not necessarily kill him. Actually, in front of the whole park in front of witnesses? [¶] . . . What you have to consider in returning a definition of whether or not [defendant]'s guilty of murder, what murder is, and the court's going to instruct you that in order to find someone guilty of first-degree murder, you must find that the actions of the person who commits the crime were willful, premeditated, and deliberate." Later counsel argued, "My concept of what happened in this case is that, if anything, if [defendant] is guilty of anything, it's guilty of a second-degree murder, and the judge will instruct you on that. And by the second-degree murder, you have to prove or you have to adopt the notion that [defendant] went there– [interruption by defendant]. [¶] . . . [¶] As you can tell by now that the main thrust of my

12

argument is to show you that all the actions that have been attributed to [defendant] do not rise to be a murder in the first degree . . . . However, I would not quarrel if you came to the decision that they do warrant a verdict of murder in the second degree . . . . You may then consider finding him guilty of murder in the second degree, and that is what I implore you to do in this case. That is the thrust of my argument."

### b) Analysis

The United States Supreme Court stated that, "The right to effective assistance extends to closing arguments. [Citations.] Nonetheless, counsel has wide latitude in deciding how best to represent a client, and deference to counsel's tactical decisions in his closing presentation is particularly important because of the broad range of legitimate defense strategy at that stage. Closing arguments should 'sharpen and clarify the issues for resolution by the trier of fact,' [citation], but which issues to sharpen and how best to clarify them are questions with many reasonable answers. Indeed, it might sometimes make sense to forgo closing argument altogether. [Citations.] Judicial review of a defense attorney's summation is therefore highly deferential . . . ." (*Yarborough v. Gentry* (2003) 540 U.S. 1, 5-6.)

Counsel did argue in his closing statement that defendant was not guilty of murder because defendant did not intend to kill Brown. The strategy of defendant's counsel was not an "all or nothing" approach with regard to the charges against defendant for murder. He argued that defendant did not intend to kill Brown, attempting to negate that defendant was guilty of murder, whether in the first or second degree. He suggested that if the jury found defendant guilty of murder at all, it should find that he is guilty of second degree murder not first degree murder. During closing arguments, defendant's counsel argued that "what happened in this case is that, if anything, if [defendant] is guilty of anything, it's guilty of a second-degree murder . . . ." Yet, he did appear to close with a request that the verdict be second degree murder.

"When the time came to argue the case to the jury, . . . counsel had to base the tactical decisions on how the trial actually went, not how it might have gone." (*People v.*

13

*Freeman* (1994) 8 Cal.4th 450, 498.) It is a reasonable strategy for defense counsel to maintain his credibility with the jury. (*Ibid.* [importance of maintaining credibility before the jury]; *People v. Mitcham* (1992) 1 Cal.4th 1027, 1060-1061 ["good trial tactics often demand complete candor with the jury, and . . . in light of the weight of the evidence incriminating a defendant, an attorney may be more realistic and effective by avoiding sweeping declarations of his or her client's innocence"].) "The mere circumstance that a different, or better, argument could have been made is not a sufficient basis for finding deficient performance by defense counsel. [Citations.]" (*People v. Ledesma* (2006) 39 Cal.4th 641, 748.) "Even if some of the arguments [not made] would unquestionably have supported the defense, it does not follow that counsel was incompetent for failing to include them. . . . [J]udicious selection of arguments for summation is a core exercise of defense counsel's discretion." (*Yarborough v. Gentry, supra,* 540 U.S. at pp. 7-8.)

Even if defendant's counsel abandoned his argument that defendant was not guilty of murder because defendant did not intend to kill Brown, the record does not disclose his reasons for doing so. Defendant contends that there is no satisfactory explanation for his counsel's conduct in effectively abandoning this "no intent to kill" argument before the jury because he initially made that argument and there was evidence to support it. As noted above, however, "'Murder that is committed with malice but is not premeditated is of the second degree.'" (*People v. Prince*, *supra*, 40 Cal.4th at p. 1266.) There was evidence that defendant stabbed Brown eight times, and a videotape of the stabbing incident was played for the jury. Brown sustained two holes in his lung and a lateral injury to his heart. One of the main blood vessels to his heart was lacerated, blood was "gushing out" from Brown's stab wounds, and there "was a pool of blood" at the scene of the stabbing. According to one of Brown's treating physician, Brown's injuries were life threatening. A jury could have reasonably inferred from the evidence that defendant intended to kill Brown. There is a tenable explanation, therefore, for his counsel's conduct in not pursing the "no intent to kill" argument before the jury, and by alternatively arguing that if defendant was guilty of murder at all, he was guilty of second

14

degree murder not first degree murder. Accordingly, defendant's argument of ineffective assistance of counsel is not appropriate for resolution on direct appeal.

### 3. Expert Testimony on "Fight or Flight" Syndrome

Defendant contends that he received ineffective assistance of counsel because his counsel should have presented expert testimony on the "fight or flight" syndrome to negate the element of malice. Defendant has not shown he received ineffective assistance of counsel on direct appeal.

The decision of defendant's counsel not to call a "fight or flight" expert to testify does not establish that his representation of defendant was deficient "Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. [Citation.] A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "'might be considered sound trial strategy.'" [Citation.] There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way. [Citation.]" (*Strickland v. Washington* (1984) 466 U.S. 668, 689-690.) "Whether to call certain witnesses is . . . a matter of trial tactics, unless the decision results from unreasonable failure to investigate. [Citation.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 334.)

In addition, the record does not show the reason defendant's counsel did not present expert testimony on the "fight or flight" syndrome. Indeed, defendant's counsel

could have concluded reasonably that the "fight or flight" syndrome did not apply. An automatic fight or flight response is based on research that a person who believes his or her life is threatened might automatically fight if that person has the ability to do so, or flee from the life-threatening event if that person lacks the ability to fight but is capable of fleeing. (*People v. Hill* (2011) 191 Cal.App.4th 1104, 1115.) There is no evidence in the record from which a reasonable jury could conclude that the incident with Brown threatened defendant's life. Defendant did not establish on direct appeal he received ineffective assistance of counsel because his counsel did not present expert testimony on the "fight or flight" syndrome.

### C. Self-Representation

Defendant contends that the trial court violated his constitutional right to self-representation when it denied his request to represent himself made during his counsel's closing argument. We disagree.

#### 1. Applicable Law

"A trial court must grant a defendant's request for self-representation if the defendant unequivocally asserts that right within a reasonable time prior to the commencement of trial, and makes his request voluntarily, knowingly, and intelligently. (*People v. Welch* (1999) 20 Cal.4th 701, 729 [85 Cal.Rptr.2d 203, 976 P.2d 754]; *People v. Windham* (1977) 19 Cal.3d 121, 127-128 [137 Cal.Rptr. 8, 560 P.2d 1187] (*Windham*).) As the high court has stated, however, '*Faretta* itself and later cases have made clear that the right of self-representation is not absolute.' (*Indiana v. Edwards* (2008) 554 U.S. 164, 171 [171 L.Ed.2d 345, 128 S.Ct. 2379, 2384]; see *Jones v. Barnes* (1983) 463 U.S. 745, 751 [77 L.Ed.2d 987, 103 S.Ct. 3308], citing *Faretta*, *supra*, 422 U.S. 806 ['we have held that, with some limitations, a defendant may elect to act as his or her own advocate . . .'].) Thus, a *Faretta* motion may be denied if the defendant is not competent to represent himself (*Indiana v. Edwards*, at p. 178 [128 S.Ct. at p. 2388]), is disruptive in the courtroom or engages in misconduct outside the courtroom that

'seriously threatens the core integrity of the trial' (*People v. Carson* (2005) 35 Cal.4th 1, 6 [23 Cal.Rptr.3d 482, 104 P.3d 837]; see *id.* at p. 8; *Faretta*, at p. 834, fn. 46), or the motion is made for purpose of delay (*People v. Marshall* (1997) 15 Cal.4th 1, 23 [61 Cal.Rptr.2d 84, 931 P.2d 262] (*Marshall*))." (*People v. Lynch* (2010) 50 Cal.4th 693, 721-722, abrogated on another point in *People v. McKinnon* (2011) 52 Cal.4th 610, 637-643.)

The California Supreme Court also has "long held that a self-representation motion may be denied if untimely. ([*People v.*] *Windham* [(1977)] 19 Cal.3d [121,] 127-128.)" (*People v. Lynch*, *supra*, 50 Cal.4th at p. 722.) "In order to invoke the constitutionally mandated unconditional right of self-representation, a defendant must assert that right within a reasonable time prior to trial. The latter requirement serves to prevent a defendant from misusing the motion to delay unjustifiably the trial or to obstruct the orderly administration of justice. [Citation.] If the motion is untimely—i.e., not asserted within a reasonable time prior to trial—the defendant has the burden of justifying the delay. [Citation.]" (*People v. Horton* (1995) 11 Cal.4th 1068, 1110 [motion made on the day of trial was scheduled to start was untimely] (italics added).) "'[O]nce a defendant has chosen to proceed to trial represented by counsel,' a defendant's motion for self-representation is 'addressed to the sound discretion of the court.' (Fn. omitted.) (*Windham*, at p. 128.)" (*People v. Lynch*, *supra*, 50 Cal.4th at p. 722.)

### 2. *Background Facts*

During closing argument by defendant's counsel, the following exchange occurred: "[Defendant's counsel:] My concept of what happened in this case is that, if anything, if [defendant] is guilty of anything, it's guilty of a second-degree murder, and the judge will instruct you on that. And by the second-degree murder, you have to prove or you have to adopt the notion that [defendant] went there—[Defendant:] Excuse me, judge. Hold on. This— [¶] [Trial court:] [Defendant]. [¶] [Defendant:] Hold on, man. [¶] [Trial court:] [Defendant], if you cannot contain yourself at this point in time, you're going to have to absent yourself from your closing argument. [¶] [Defendant:] I

17

understand that may I speak to my lawyer because this ain't right. [¶] [Trial court:] You may. [¶] . . . [¶] [Defendant:] Trying to throw me over, my life over the cliff. It's my life, my life in my hands, not yours. [¶] [Trial court:] The record should reflect that all the jurors have left the courtroom. [Defendant], in front of the jury you are compromising— [¶] [Defendant:] It didn't compromise me, Your Honor. [¶] [Trial court:] Your attorney's ability to argue what he believes is your best defense. [¶] [Defendant:] That's not my best defense, and if he would have went up there—this is my life. I have the paperwork that I told him to go up there and use. This is something that he just came up with, and had I seen that video earlier when I asked him to come down there and see me with the video, it clearly showed that I had nothing in my hand. I have to see this when I'll take the witness stand, which he urged me against. This is absurd. I don't know what he went up there and did. [¶] . . . [¶] [Trial court:] [Defendant], I am at this point going to instruct you, if you are prepared to refrain from interrupting your attorney, you may remain in this courtroom while your attorney— [¶] [Defendant:] Not with that defense. Not with that defense. I want the record to reflect that I have my own closing argument here. I have my own paperwork here. We talking about witnesses being threatened. We talk about being threatened, you allowed this to come in here, talking about paperwork with detective on the these days that he's clearly not—

[¶] [Trial court:] [Defendant], are you going to control yourself? If you cannot—

[¶] [Defendant:] Because this is my life. [¶] [Trial court:] If you speak out one more time, you will not be in this courtroom when they return. And what does that show them? It shows them a man— [¶] [Defendant:] That's wanting to fight for his life. [¶] [Trial court:] Who cannot control himself. And that does not help you. [¶] [Defendant:] I'm not going to sit back, Your Honor, be falsely accused of a crime that I didn't commit and then go to prison for the rest of my life. [¶] [Trial court:] Okay, [defendant]. [¶] [Defendant:] Based on something that he feels is best for him. He's not gonna do life in prison. I am. [¶] . . . [¶] [Trial court:] Okay, [defendant], are you telling the court that you will continue to interrupt your attorney if he continues with this? [¶] [Defendant:] With this, what he's saying, what he's saying, that's the stuff that's coming out of his

18

mouth, placing a weapon in my hand, standing up saying I'm guilty of murder. I'll interrupt him with that. He should be up here doing his job. He work for me. [¶] [Trial court:] Okay, deputy, based on [defendant]'s representation— [¶] [Defendant's counsel:] May I ask a question? [¶] [Trial court:] You may. [¶] [Defendant's counsel:] Is it possible that you could relieve me and have [defendant] represent himself? [¶] [Trial court:] Not at this juncture. No. [¶] [Defendant:] Why not? [¶] [Trial court:] Because your attorney has not been relieved prior. It would be completely unheard of, simply because your theory as to what happened disagrees with your attorney's. [¶] [Defendant:] But you see, Your Honor, he's not even been in the case the whole time, Your Honor. It seems like he's not even been in the case the whole time. He's been up to here with murder cases, and he says that 'I'm a prominent attorney,' saying, 'I got many of these cases.' I've been sitting here being patient watching him frame me, not having the paperwork here. Evidence is coming up missing. He's not doing his job as a prominent attorney. And I sat back here and placed faith in him, but I'm not standing here in closing argument watching him throw me over the cliff. This is not no prominent attorney, especially someone of that caliber. [¶] [Trial court:] Based on your representation— [¶] [Defendant:] I can represent myself just fine. And I can speak eloquently just fine, Your Honor, and I can get my point across in the points in which he's not bringing up. You're talking about misconduct with the officers, threatening the witnesses to come. We talking about throwing people in jail to bring them up higher to falsify statements on the stand. We talking about numerous of testimony been concocted each time that they took the stand from July 29th to the time we were here for the courts. I have transcripts out of mine here. I have the same paperwork that he's not even mentioned. He's talking about a murder. We talking about reasonable doubt. [¶] [Trial court:] [Defendant]. [¶] [Defendant:] Is the statements that they talking about, is they telling the truth or is they forced? [¶] [Trial court:] Okay. and those areas were explored with the witnesses. [¶] [Defendant:] Well, it didn't come out of my lawyer mouth. He never talked about it. Here on July 29th says that officer— [¶] [Trial court:] Sir, Sir, Sir. Sir, take—[defendant] will now be escorted out of the

19

courtroom.  [¶]  [Defendant's counsel:]  May we have a recess in the trial to give him a chance to cool down?  [¶]  [Trial court:]  No. okay.  I will make a record briefly before we invite the jurors to come back in.  The court has indicated when [defendant] was present, it has observed the videotape, and it clearly shows [defendant] stabbing Mr. Brown.  Should the court of appeal have any question as to the state of the evidence, I would invite them to carefully review that videotape, and we have a situation where [defendant] when he chose to testify presented in the court's view a version of what happened that simply does not comport with the contents of that video.  [¶]  And so now [defendant] is in that very problematic situation where he is asking the jurors to accept a version of events that is simply untenable, and I understand exactly what [defendant's counsel] is attempting to do.  I see [defendant's counsel]'s arguments as an appreciation of the staggering portent of that video, the uncontradicted eyewitness testimony of people who were standing very close to . . . Brown when he was stabbed and making a very calculated legal decision that is intended to serve ultimately [defendant]'s best interests in at least getting a trier of fact to move away from a first degree, premeditated, and deliberated murder.  I see that as clearly as I see the nose on my face.  And simply because [defendant] has put himself in a completely untenable position and now seeks to create an outburst in the courtroom to somehow derail the trial is a technique that this court is not going to allow to succeed."  The record reflects that defendant was no longer in the courtroom.

### 3.     Analysis

As defendant concedes, his *Faretta* motion was not timely.  Defendant made his *Faretta* motion during his counsel's closing argument.  Defendant's motion for self-representation, therefore, was addressed to the sound discretion of the trial court.  (*People v. Lynch*, *supra*, 50 Cal.4th at p. 722.)

A *Faretta* motion may be denied if the defendant is disruptive in the courtroom. (*People v. Lynch*, *supra*, 50 Cal.4th at p. 721.)  Defendant was disruptive to the proceedings.  He interrupted his counsel during closing arguments, and failed to control

his outbursts despite the trial court's numerous warnings that he do. The trial court did not err in denying defendant's motion to represent himself.

In addition, a *Faretta* motion may be denied if the motion is made for purpose of delay. (*People v. Lynch*, *supra*, 50 Cal.4th at p. 721.) Defendant discussed representing himself only after his counsel raised the possibility. Although defendant stated that he had his own closing argument ready, the trial court was not required to believe his representation. Indeed, the trial court concluded that defendant had put himself in an "untenable situation" and "now seeks to create an outburst in the courtroom to somehow derail the trial" and the trial court was not going to let defendant succeed with that. The trial court's inference that defendant was attempting to interfere with the trial was supportable.

Even if the trial court erred in denying his request to represent himself, the error was harmless. The trial court's denial of an untimely *Farretta* motion is not error per se; it is reviewed under the harmless error test of reasonable probability of a more favorable result standard stated in *People v. Watson* (1956) 46 Cal.2d 818, 836. (*People v. Nicholson* (1994) 24 Cal.App.4th 584, 594-595.)

"It is candidly recognized that a defendant who represents himself virtually never improves his situation or achieves a better result than would trained counsel. [Citation.]" (*People v. Rivers* (1993) 20 Cal.App.4th 1040, 1051-1052.) To the extent defendant would have argued during closing argument to the jury that he was not guilty of murder because he did not intend to kill Brown, as noted above, it is not reasonably likely that he would have received a more favorable result. There was evidence that defendant stabbed Brown eight times, and his injuries were life threatening. Brown sustained two holes in his lung, a lateral injury to his heart, and one of the main blood vessels to the heart was lacerated. Brown lost a substantial amount of blood.

Defendant contends that any error by the trial court in denying his request to represent himself was not harmless because he denied stabbing Brown and he claimed that the video recording of the incident did not show that he had a weapon. Defendant argues, therefore, that "a reasonable argument may well have been available that it was

21

not in fact [defendant] who inflicted [Brown's] injuries." There was overwhelming evidence, however, that defendant stabbed Brown. Hall, Stewart, and Montgomery testified that they saw a knife in defendant's hand at the time of the incident. Stewart saw Patterson reach into her purse, take the knife out, and hand it to defendant. A knife sheath was later found in Patterson's purse. Montgomery saw defendant stab Brown eight times and drop the knife. Hall testified that after the stabbing, he saw defendant hand the knife back to Patterson. Hall pointed out defendant and Patterson to Officer Toris and said that defendant had just stabbed somebody. Hall and Montgomery identified defendant from a photographic line up as the person who stabbed Brown. It was not reasonably probable that defendant would achieve a more favorable result had the trial court granted his request to represent himself.

### D.  Defendant's Removal from the Courtroom

Defendant contends that trial court violated his constitutional rights to confrontation and due process when it removed him from the courtroom. The trial court did not violate defendant's constitutional rights.

### 1.  *Standard of Review*

"'An appellate court applies the independent or de novo standard of review to a trial court's exclusion of a criminal defendant from trial, either in whole or in part, insofar as the trial court's decision entails a measurement of the facts against the law.' (*People v. Waidla* (2000) 22 Cal.4th 690, 741 [94 Cal.Rptr.2d 396, 996 P.2d 46])" (*People v. Mayham* (2013) 212 Cal.App.4th 847, 850.) In making this determination, we "give considerable deference to the trial court's judgment as to when a disruption has occurred or may reasonably be anticipated." (*People v. Welch* (1999) 20 Cal.4th 701, 773; see also *Illinois v. Allen* (1970) 397 U.S. 337, 343 ["trial judge confronted with disruptive, contumacious, stubbornly defiant defendants must be given sufficient discretion to meet the circumstances of each case"].)

*2.      Analysis*

"'A criminal defendant, broadly stated, has a right to be personally present at trial under various provisions of law, including the confrontation clause of the Sixth Amendment to the United States Constitution, as applied to the states through the due process clause of the Fourteenth Amendment; the due process clause of the Fourteenth Amendment itself; section 15 of article I of the California Constitution; and sections 977 and 1043 of the Penal Code.' (*People v. Waidla*, *supra*, 22 Cal.4th at p. 741.) But a defendant may be removed from the courtroom during trial in '[a]ny case in which the defendant, after he has been warned by the judge that he will be removed if he continues his disruptive behavior, nevertheless insists on conducting himself in a manner so disorderly, disruptive, and disrespectful of the court that the trial cannot be carried on with him in the courtroom.' (§ 1043, subd. (b)(1); see *Illinois v. Allen* (1970) 397 U.S. 337, 343 [25 L.Ed.2d 353, 90 S.Ct. 1057]; *People v. Welch* (1999) 20 Cal.4th 701, 774 [85 Cal.Rptr.2d 203, 976 P.2d 754].)" (*People v. Mayham*, *supra*, 212 Cal.App.4th at p. 850.)

As noted above, the record suggests defendant was disruptive during the trial proceedings. Despite being warned by the trial court that he would be removed from the courtroom if he continued his disruptive behavior, the record suggests that defendant failed to accede to the trial court's admonitions. The trial court did not abuse its discretion in removing defendant from the courtroom.

Defendant contends that the trial court erred in denying his counsel's request of the trial court to order a recess of the trial proceeding to afford defendant "a chance to cool down." Defendant does not cite to any authority that the trial court is required to provide defendant with "a chance to cool down" before it may properly remove him from the courtroom. Also, we cannot determine from the record the volume or intensity of defendant's voice, or his physical demeanor. The trial court witnessed that. The record discloses, however, that defendant not only interrupted his counsel during closing arguments, but he ignored the trial court's numerous warnings to control his

23

interventions. It does not appear from the record that defendant would change his behavior had trial court granted a brief recess of the proceedings,.

Defendant also contends that instead of removing him from the courtroom, the trial court should have allowed him to represent himself. As discussed above, however, that alternative was not available to defendant because he was disruptive.

Even if the trial court erred in removing defendant from the courtroom, defendant failed to demonstrate that he was prejudiced. "'Erroneous exclusion of the defendant is not structural error that is reversible per se, but trial error that is reversible only if the defendant proves prejudice. [Citations.]' (*People v. Perry* [(2006)] 38 Cal.4th [302,] 312.) "'A defendant claiming a violation of the right to personal presence at trial bears the burden of demonstrating that [the defendant's] personal presence could have substantially benefited the defense. [Citation.]" [Citations.]' (*People v. Price* (1991) 1 Cal.4th 324, 408 [3 Cal.Rptr.2d 106, 821 P.2d 610], superseded by statute on other grounds as stated in *People v. Hinks* (1997) 58 Cal.App.4th 1157, 1161 [68 Cal.Rptr.2d 440].)" (*People v. Johnson* (2013) 221 Cal.App.4th 943, 949.) Defendant made no such showing.

### E. Jury Instruction Regarding Causation

Defendant contends that the trial court erred in instructing the jury on the issue of causation. According to defendant, the trial court should have modified the instructions on causation, sua sponte, to advise the jury that, if the treatment by Los Angeles County/USC Medical Center in delaying surgery and transferring him to an inadequate facility were unforeseeable intervening causes of death, and they were the cause of Brown's death, it could conclude that defendant was not guilty of the murder. The trial court did not err.

#### 1. Standard of Review

Typically, "[a] trial court has a duty to instruct the jury 'sua sponte on general principles which are closely and openly connected with the facts before the court.'

24

[Citation.]" (*People v. Abilez* (2007) 41 Cal.4th 472, 517.) "In the absence of a request for a particular instruction, a trial court's obligation to instruct [sua sponte] on a particular defense arises '"only if [1] it appears that the defendant is relying on such a defense, or [2] if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case."' [Citations.]" (*People v. Dominguez* (2006) 39 Cal.4th 1141, 1148; *People v. Maury* (2003) 30 Cal.4th 342, 424.)

### 2. Background Facts

The trial court, without objection by counsel, instructed the jury with a modified version of CALCRIM No. 620, stating in pertinent part, "There may be more than one cause of death. An act causes death only if it is a substantial factor in causing the death. A substantial factor is more than a trivial or remote factor. However, it does not need to be the only factor that causes the death. [¶] The failure of the medical staff to use reasonable care in treating . . . Brown may have contributed to the death. But if the injury inflicted by the defendant was a substantial factor causing the death, then the defendant is legally responsible for the death even though the medical staff may have failed to use reasonable care. [¶] On the other hand, if the injury inflicted by the defendant was not a substantial factor causing the death, but the death was caused by grossly improper treatment by the medical staff, then the defendant is not legally responsible for the death. [¶] If you have a reasonable doubt whether the defendant's act caused the death, you must find him not guilty."

### 3. Analysis

Defendant contends that he is not liable for murder because the inadequate medical treatment of Brown by the medical staff at Los Angeles County/USC Medical Center supervened as the cause of Brown's death. That is, according to defendant, that inadequate medical treatment was an unforeseeable intervening cause of Brown's death. Defendant argues that Brown's death was caused by the medical staff at Los Angeles

25

County/USC Medical Center in delaying his surgery; and after "properly repair[ing]" Brown's wounds such that he was "stabilized," transferring him to Longwood Manor Convalescent Hospital that had limited medical resources, where Brown developed medical problems.  Defendant argues that Brown was too weak from the delay in his surgery to withstand those medical problems, and those medical problems lead to his death.

"Intervening causes in criminal cases are typically described as either 'dependent' or 'independent.'  A dependent intervening cause will not absolve a defendant of criminal liability while an independent intervening cause breaks the chain of causation and does absolve the defendant.  [Citation.]  'An intervening cause may be a normal or involuntary result of the defendant's original act.  Such a cause is said to be "dependent," and does not supersede; i.e., the defendant is liable just as in the direct causation case.'  [Citation.]  An 'independent' intervening 'act may be so disconnected and unforeseeable as to be a superseding cause; i.e., in such a case the defendant's act will be a remote, and not the proximate, cause.'  [Citation.]"  (*People v. Schmies* (1996) 44 Cal.App.4th 38, 48, fn. omitted.)  In terms of a foreseeable intervening cause, "'"'The precise consequence need not have been foreseen; it is enough that the defendant should have foreseen the possibility of some harm of the kind which might result from his act.'  [Citation.]"  [Citation.]'  [Citations.]"  (*People v. Cervantes* (2001) 26 Cal.4th 860, 871.)

"'If a person inflicts a dangerous wound on another, it is ordinarily no defense that inadequate medical treatment contributed to the victim's death.  [Citations.]  To be sure, when medical treatment is grossly improper, it may discharge liability for homicide if the maltreatment is the sole cause of death and hence an unforeseeable intervening cause.  [Citations.]'  [Citation.]"  (*People v. Scott* (1997) 15 Cal.4th 1188, 1215, citing *People v. Roberts* (1992) 2 Cal.4th 271, 312.)  "'[T]he proper, and probably generally accepted, view . . . [is] that mere negligence [in the treating of a wound] is no defense [to a charge of homicide] even though [the medical treatment] it is the sole cause of death because it is a foreseeable intervening cause.  [Citations.]'"  (*People v. McGee* (1947) 31 Cal.2d 229, 240.)

26

The jury was properly instructed on causation. Having been instructed that defendant is not legally responsible for Brown's death if it was caused by the medical staff's grossly improper treatment of him, and in finding defendant guilty of second degree murder, the jury necessarily found that Brown's death was not caused by the medical staff's grossly improper medical treatment of him—that is, any medical malpractice committed by the medical staff was reasonably foreseeable.

### F.      Sua Sponte Instruction on Lesser Included Offenses

Defendant contends that the trial court erred by not instructing the jury sua sponte on the lesser included offenses of voluntary and involuntary manslaughter. Defendant argues that the trial court should have instructed the jury on voluntary manslaughter because there was evidence that he acted based on a sudden quarrel or heat of passion, and it should have instructed the jury on involuntary manslaughter because there was evidence that he was voluntarily intoxicated with the drug ecstasy. The trial court properly instructed the jury.

#### 1.      Standard of Review

"We apply the independent or de novo standard of review to the failure by the trial court to instruct on an assertedly lesser included offense. [Citation.]" (*People v. Cole* (2004) 33 Cal.4th 1158, 1218.)

#### 2.      Applicable Law

"In criminal cases, even absent a request, the trial court must instruct on general principles of law relevant to the issues raised by the evidence. [Citation.] This obligation includes giving instructions on lesser included offenses when the evidence raises a question whether all the elements of the charged offense were present, but not when there is no evidence the offense was less than that charged. [Citation.]" (*People v. Koontz* (2002) 27 Cal.4th 1041, 1085.) "[T]he existence of '*any* evidence, no matter how weak' will not justify instructions on a lesser included offense, but such instructions are required

27

whenever evidence that the defendant is guilty only of the lesser offense is 'substantial enough to merit consideration' by the jury. [Citations.] 'Substantial evidence' in this context is '"evidence from which a jury composed of reasonable [persons] could . . . conclude[ ]"' that the lesser offense, but not the greater, was committed. [Citations.]" (*People v. Breverman* (1998) 19 Cal.4th 142, 162; *People v. Barton* (1995) 12 Cal.4th 186, 200-201 [a trial court need instruct on a lesser included offense only when there is substantial evidence, "not when the evidence is 'minimal and insubstantial'"].)

"'California statutes have long separated criminal homicide into two classes, the greater offense of murder and the lesser included offense of manslaughter.'" (*People v. Martinez* (2007) 154 Cal.App.4th 314, 335.) "Voluntary and involuntary manslaughter are lesser included offenses of murder. [Citations.]" (*People v. Thomas* (2012) 53 Cal.4th 771, 813.)

"'"'Murder is the unlawful killing of a human being with malice aforethought. [Citation.] A defendant who commits an intentional and unlawful killing but who lacks malice is guilty of . . . voluntary manslaughter. [Citation.]" [Citation.]'" (*People v. Rios* (2000) 23 Cal.4th 450, 460.) Except for acts committed in the driving of a vehicle, involuntary manslaughter is "the commission of an unlawful act, not amounting to felony; or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection." (§ 192, subd. (b).)

### 3. Analysis

#### a) Sudden Quarrel or Heat of Passion

A killing "upon a sudden quarrel or heat of passion" is voluntary manslaughter. (§ 192, subd. (a).) If there is sufficient provocation and a defendant acts on a sudden quarrel or heat of passion, malice is presumed to be absent. (*People v. Lee* (1999) 20 Cal.4th 47, 59.) Because heat of passion reduces an intentional, unlawful killing from murder to voluntary manslaughter by negating the element of malice, heat of passion voluntary manslaughter is a lesser necessarily included offense of intentional murder. (*People v.*

*Breverman*, *supra*, 19 Cal.4th at p. 154.)  The test of whether there is sufficient provocation or heat of passion such that it can negate malice and thereby reduce murder to voluntary manslaughter is objective.  (*People v. Steele* (2002) 27 Cal.4th 1230, 1253.)  That heat of passion must be such that it would be aroused naturally in an ordinarily reasonable person in the same circumstances.  (CALJIC No. 8.42.)

Defendant contends that there was evidence that he stabbed Brown based on a sudden quarrel or in the heat of passion.  He argues that prior to the incident near the Mission, defendant and Brown had a fight during which defendant was injured; defendant was angry; and immediately before the stabbing near the Mission, Brown cursed at defendant.

"[N]o particular period of time need elapse between a passion-producing quarrel and the subsequent killing."  (*People v. Edgmon* (1968) 267 Cal.App.2d 759, 765.)  However, "'[I]f sufficient time has elapsed between the provocation and the fatal blow for passion to subside and reason to return, the killing is not voluntary manslaughter— "the assailant must act under the smart of that sudden quarrel or heat of passion." [Citation.]' [Citation.]"  (*People v. Beltran* (2013) 56 Cal.4th 935, 951.)  The quarrel or heat of passion required for voluntary manslaughter must occur ""suddenly as a response to the provocation, and not belatedly as revenge or punishment.  Hence, the rule is that, if sufficient time has ela[psed] for the passions of an ordinarily reasonable person to cool, the killing is murder, not manslaughter." [Citation.]'"  (*People v. Hach* (2009) 176 Cal.App.4th 1450, 1458.)

Defendant testified that he was upset over fighting with Brown at the park.  After that fight, but before the stabbing incident, defendant went to his hotel room where he stayed for about one hour.  Defendant then left his hotel room to go the park to recover his personal belongings that he left there, and "get more drugs."  10 minutes later, defendant arrived at the park.  He then located his personal items, and he spoke to his friend.  Defendant then traveled from the park to the front of the Mission where he had the confrontation with Brown during which witnesses saw defendant stab Brown.  According to defendant, therefore, well over one hour elapsed between his fight with

29

Brown in the park and the time he allegedly stabbed Brown in front of the Mission. Sufficient time had elapsed for the passions of an ordinarily reasonable person to cool. (*People v. Hach*, *supra*, 176 Cal.App.4th at p. 1458.) To the extent defendant wanted revenge against Brown, an act of belated revenge or punishment for defendant's earlier confrontation with Brown does not warrant an instruction on heat of passion voluntary manslaughter. (*People v. Beltran*, *supra*, 56 Cal.4th at p. 948; *People v. Breverman*, *supra*, 19 Cal.4th at p. 163; *People v. Hach*, *supra*, 176 Cal.App.4th at p. 1458.)

Defendant contends that when he saw Brown at the front of the Mission, Brown cursed at him. This does not warrant a jury instruction for voluntary manslaughter based on a sudden quarrel or heat of passion. "Although section 192, subdivision (a), refers to 'sudden quarrel or heat of passion,' the factor which distinguishes the 'heat of passion' form of voluntary manslaughter from murder is provocation. The provocation which incites the defendant to homicidal conduct in the heat of passion must be caused by the victim [citation], or be conduct reasonably believed by the defendant to have been engaged in by the victim. [Citations.] The provocative conduct by the victim may be physical or verbal, but the conduct must be sufficiently provocative that it would cause an ordinary person of average disposition to act rashly or without due deliberation and reflection. [Citations.] 'Heat of passion arises when "at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment."' [Citation.]" (*People v. Lee*, *supra*, 20 Cal.4th at p. 59.) As noted above, "The test of adequate provocation is an objective one . . . . The provocation must be such that an average, sober person would be so inflamed that he or she would lose reason and judgment." (*Id*. at p. 60.) Assuming Brown cursed at defendant as defendant contends, it would not cause an average person to be so inflamed as to lose reason and judgment and repeatedly stab Brown without due deliberation and reflection. (*Id*. at pp. 59-60.)

30

b)      Voluntary Intoxication

"'When a person renders himself or herself unconscious through voluntary intoxication and kills in that state, the killing is attributed to his or her negligence in self-intoxicating to that point, and is treated as involuntary manslaughter.' [Citations]" (*People v. Abilez, supra*, 41 Cal.4th at p. 516.)  "'Unconsciousness does not mean that the actor lies still and unresponsive.  Instead, a person is deemed "unconscious" if he or she committed the act without being conscious thereof.' [Citations.]" (*People v. Rogers* (2006) 39 Cal.4th 826, 887.)

In *People v. Abilez, supra*, 41 Cal.4th 472, the court stated that, "The evidence here shows defendant had consumed some unknown amount of alcohol, but there was no evidence he was so intoxicated that he could be considered unconscious.  He went to the victim's home, spoke to his brother . . ., killed [the victim], and then ransacked her and [her roommate's] bedrooms, loading [the victim's] car with stolen items before driving away.  Later, he tried to sell the stolen goods . . . .  Nothing in these facts even hints that defendant was so grossly intoxicated as to have been considered unconscious." (*Id*. at p. 516.)

The only evidence of defendant's intoxication was his testimony that he was "high on ecstasy" at the time he was cut by Brown during the first altercation with him in the park, and because he had just been discharged from parole, he did not want to go to the hospital to treat his cut because he was afraid someone would discover his use the illegal substance.  According to defendant, the alleged stabbing incident did not occur until over an hour after defendant was allegedly "high on ecstasy."  There is no evidence in the record that defendant was "high on ecstasy" at the time he allegedly stabbed Brown, when defendant consumed the drug, how much ecstasy he consumed, or of the effect defendant's consumption of ecstasy would have had on defendant at the time of his alleged stabbing of Brown.  There was no testimony that defendant was or appeared to be so intoxicated that he acted unconsciously in stabbing Brown eight times.  Indeed, there is evidence that defendant acted consciously in stabbing Brown because defendant fled the scene immediately after the stabbing.  There is not sufficient evidence to support a

31

reasonable juror in finding that defendant was unconscious due to voluntary intoxication at the time he stabbed Brown. (*People v. Abilez*, *supra*, 41 Cal.4th at p. 516; *People v. Turk* (2008) 164 Cal.App.4th 1361, 1368, 1379.)

### G.    Conduct Credit

The Attorney General contends, and defendant does not oppose, that defendant is not entitled to the 85 days of conduct credit awarded to him by the trial court. We agree. Section 2933.2 provides that any person who is convicted of murder is not entitled to conduct credit.

### DISPOSITION

Defendant's judgment is modified to provide that defendant is not entitled to 85 days of conduct credit. The matter is remanded for the trial court to amend the abstract of judgment accordingly. The trial court shall forward the amended abstract of judgment to the Department of Corrections and Rehabilitation. In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.

MOSK, Acting P. J.

We concur:

KRIEGLER, J.

MINK, J.[*]

---

[*]    Retired Judge of the Superior Court of Los Angeles County, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

32